Argued and submitted November 9, 1998, decision of Court of Appeals affirmed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings June 11, 1999

# Larry J. VANDERMAY
## and Tamara Vandermay,
## husband and wife,
## and Flying Dutchman Enterprises,
## an Oregon corporation,
*Respondents on Review,*

*v.*

## Paul D. CLAYTON,
*Petitioner on Review.*

## (CC 92-2104; CA A91235; SC S44717)

984 P2d 272

Thomas W. Brown, of Cosgrave, Vergeer & Kester, LLP, Portland, argued the cause for petitioner on review. With him on the briefs was Barbara L. Johnston of Brisbee & Stockton.

Jeanyse R. Snow, of Snow & Snow, Astoria, argued the cause and filed the brief for respondents on review.

LEESON, J.

## LEESON, J.

In this legal malpractice action, the question is whether the trial court erred in granting defendant's motion for a directed verdict on the ground that, without expert testimony, the jury could not have found that defendant had been negligent. The Court of Appeals held that expert testimony was not necessary and reversed the trial court. *Vandermay v. Clayton*, 147 Or App 95, 935 P2d 1221 (1997). For the reasons that follow, we affirm.

■      We review the trial court's grant of a directed verdict for errors of law, considering the evidence in the light most favorable to plaintiff,[1] the party against whom the verdict was entered. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). In that light, the facts are as follows: Plaintiff worked for a major oil company for many years in a variety of capacities, including as a dealer representative, training instructor, and territory manager. While working for that company in California, plaintiff and Bob Wester decided that they would like to buy an oil company in Oregon. In 1977, they formed the VanWest Oil Company (VanWest) and negotiated the purchase of Macklin Oil Company (Macklin) in Tillamook. After they had made a tentative agreement for the purchase of Macklin, plaintiff and Wester employed defendant, a Eugene lawyer and Wester's brother-in-law, to "[handle] the legalese with the Macklins' attorney and put the deal together." In addition to buying Macklin, which consisted of two bulk oil plants and several service stations, VanWest leased several other service stations and entered into several supply contracts to deliver gasoline and petroleum products in the area.

After the purchase of Macklin, plaintiff and his wife moved to Tillamook. Defendant served as plaintiff's corporate and personal lawyer from 1977 until March 1990, and plaintiff relied on defendant's legal advice. During plaintiff's

---

[1] The plaintiffs in this action are Larry Vandermay, Tamara Vandermay, his wife, and Flying Dutchman Enterprises, Vandermay's oil business. Neither Tamara Vandermay nor Flying Dutchman Enterprises played a significant role in the events leading to this litigation. Therefore, we use the singular term "plaintiff" in this opinion.

ownership of VanWest, the corporation acquired additional service stations and entered into more supply agreements. In 1983, Wester sold his shares in VanWest to plaintiff, and defendant represented both parties in that transaction.

In 1986, plaintiff decided to sell VanWest, and he listed it with a real estate company in Lake Oswego. Three years later, VanWest still was on the market, and plaintiff continued to operate and expand its business. By the end of 1989, VanWest had doubled in size from what it was in 1977, and plaintiff had made improvements at several of its properties, including upgrading tanks and lines, adding car washes at service stations, and putting in a new fuel island at one of the service stations. In the spring or summer of 1989, plaintiff was planning to tear down and replace a service station and add a convenience store on West Marine Drive in Astoria (Astoria site). Those plans included applying for a loan of over $400,000 to finance the project and working with City of Astoria planning and zoning staff to acquire the necessary permits.

By the end of the 1980s, environmental rules affecting underground storage tanks were being implemented at both the national and state levels. Plaintiff realized that the bank loan for the Astoria site upgrade would not be approved without an environmental assessment. Consequently, in October 1989, he hired a company to conduct soil tests at the Astoria site. Those tests revealed soil contamination at depths of five, ten, and fifteen feet. Plaintiff believed that the contamination had been caused by small spills from storage tank filling over the years and that it would not cost much to clean it up. Plaintiff did not report the results of the soil tests to the Department of Environmental Quality (DEQ).

In October 1989, David Harris expressed an interest in buying VanWest. He submitted a written offer to plaintiff on December 19. Paragraph 11 of the offer included an indemnification provision requiring plaintiff to hold Harris harmless "against any claims, environmental or otherwise" existing before the sale. The indemnification provision also stated that Harris would accept the 1989 soil test report that showed some contamination at the Astoria site and that,

regarding that site, plaintiff's "indemnity under this paragraph will apply to the contamination conditions described therein."

Negotiations for the sale of VanWest continued for several weeks after Harris submitted his written offer, and defendant represented plaintiff in those negotiations. In January 1990, plaintiff learned that his loan application for the Astoria site upgrade had been rejected. Plaintiff also learned that there was contamination at a VanWest bulk plant site, but he had insurance coverage for any environmental contamination there, subject to a $25,000 deductible. Plaintiff was concerned about the continuing liability that he might face at the Astoria site because he knew that, under paragraph 11 of Harris's offer to purchase VanWest, Harris refused to be responsible for any cleanup at that site. Plaintiff estimated that it would cost about $2,500 to clean up the contamination that was discovered at the Astoria site in 1989. However, to "make the deal fly" with Harris, plaintiff agreed that he would pay up to $5,000 to clean up that site. Plaintiff was not willing to be responsible for more than $5,000 for that cleanup. He instructed defendant to draft a separate indemnity agreement for the sale of VanWest that limited his liability to $5,000 for cleaning up the Astoria site.

Consistent with plaintiff's instructions, on February 26, 1990, defendant submitted to Harris an indemnity agreement that provided, in part:

> "Notwithstanding that Harris Enterprise, Inc. has accepted the environmental report concerning [the Astoria site], the indemnification agreement contained in Paragraph 11 shall apply to any cleanup costs or costs of remediation of the condition existing therein, * * * in an amount up to, but not exceeding, the sum of $5,000.00."

The sale of VanWest to Harris closed on March 1, 1990. The transaction included the sale of most of VanWest's holdings, but it also included some lease-backs to VanWest, an employment contract for plaintiff, a noncompetition agreement, and an indemnity agreement. Because of the large number of documents that had to be signed, the closing lasted for more than two hours. During the closing, Harris

informed plaintiff that the indemnity agreement that defendant had drafted was unacceptable to Harris. Plaintiff gave no indication to defendant that, in light of Harris's rejection of that indemnity agreement, plaintiff was willing to be responsible for more than $5,000 to clean up the Astoria site. Harris had his lawyer prepare a different indemnity agreement covering both the bulk site where contaminates had been discovered and the Astoria site. That agreement provided:

> "The parties further understand that there is no insurance coverage available for the costs of any cleanup and remedial action at the Astoria site. As between the parties hereto, it is agreed that VanWest shall not be required to expend more than the sum of $5,000 for any costs of cleanup and remedial action at the Astoria site; provided, however, it is understood and agreed that VanWest may be liable for such costs in excess of $5,000 under applicable environmental federal and state laws."

Plaintiff read the agreement and saw that "it said $5,000 liability." He testified that he looked down the table at defendant, who indicated, apparently by the nod of his head, that it was "okay for [plaintiff] to sign it." Plaintiff signed the new indemnity agreement and the other documents, thereby completing the sale of VanWest to Harris. Plaintiff testified that he would not have proceeded with the sale of VanWest if he had known that he would be liable for "something much greater" than $5,000 to clean up the Astoria site.[2]

In October 1990, additional soil tests at the Astoria site revealed substantial contamination. In December, petroleum fumes were detected in an apartment building adjacent to the Astoria site. At that time, under one of the agreements that the parties had signed as part of the sale of VanWest,

---

[2] Defendant gave a substantially different account of what transpired between him and plaintiff at the closing meeting. According to defendant, he and plaintiff "talked about what the differences were in the form [defendant] had proposed and the form that was actually revised at [the] closing [meeting] and what that meant from the standpoint of potential exposure down the road." Defendant also testified that he told plaintiff that the indemnity agreement that Harris presented at the closing [meeting] "was not an absolute $5,000 limit." However, as noted at the outset of this opinion, we view the facts in the light most favorable to plaintiff and do not seek to resolve conflicts in the parties' testimony.

Harris employed plaintiff as an environmental control officer. Plaintiff began an investigation and soon discovered that the contamination at the Astoria site was extensive. The DEQ informed plaintiff that he should have reported the soil contamination that was discovered in 1989, and it ordered both plaintiff and Harris to clean up the site.

In subsequent litigation between plaintiff and Harris, plaintiff contended that his liability for cleaning up the Astoria site was limited to $5,000, and Harris contended that plaintiff's liability was unlimited. The trial court found that the indemnity agreement that Harris's lawyer had drafted, which plaintiff and Harris signed on March 1, 1990, was ambiguous. Ultimately, plaintiff and Harris settled their litigation, agreeing to share equally the costs of cleaning up the Astoria site. Plaintiff's share of the cost was over $585,000.

Plaintiff brought this action against defendant, alleging legal malpractice and seeking $585,895.02 in damages. At trial, plaintiff called one expert witness, a lawyer who, at that time, had specialized in environmental law for over 25 years at a large law firm in Portland. Plaintiff asked the expert if he had an opinion about what a lawyer in defendant's position, exercising due care, skill, and diligence in representing his client, would have done regarding the indemnity agreement that Harris presented to plaintiff on March 1, 1990. Defendant objected to that question on the ground that plaintiff had failed to lay an adequate foundation. According to defendant, plaintiff had failed to establish whether the expert was familiar with the quality of care that ordinarily is exercised by general practitioners in small law firms. The trial court excused the jury and conducted a hearing pursuant to OEC 103[3] and OEC

---

[3] OEC 103 provides, in part:

"(1) Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

"* * * * *

"(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

104[4] to determine whether an adequate foundation existed for the expert's opinion testimony.

In that hearing, the expert testified that he did not know the standard of care that would apply to a practitioner in defendant's circumstances but that there were others in his firm who did business with small firm practitioners. Plaintiff did not make an offer of proof regarding the expert's opinion about whether defendant's conduct breached the applicable standard of care.

The trial court concluded that the foundation for the expert's testimony was inadequate, because the expert was not personally aware of the standard of care applicable to general practitioners who provide advice in circumstances like those presented in this case. The court therefore sustained defendant's objection. Plaintiff then rested his case.

Defendant moved for a directed verdict under ORCP 60,[5] arguing that, without expert testimony on whether defendant had breached the standard of care, plaintiff had failed to present sufficient evidence. Plaintiff responded that no expert testimony was required because defendant's negligence was a simple matter of defendant's failure to secure an indemnity agreement that limited plaintiff's liability for cleaning up the Astoria site to $5,000. The trial court granted

---

"(2) The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made and the ruling thereon. It may direct the making of an offer in question and answer form.

"(3) In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."

[4] OEC 104 provides, in part:

"(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

[5] ORCP 60 provides, in part:

"Any party may move for a directed verdict at the close of the evidence offered by an opponent or at the close of all the evidence.* * * A motion for a directed verdict shall state the specific grounds therefor. * * *"

defendant's motion. It held that expert testimony was required, because it is not within the common knowledge of jurors what a lawyer in defendant's position should have done in the circumstances presented by this case.[6]

On plaintiff's appeal, the Court of Appeals held that, on the record, and absent an offer of proof by plaintiff, it could not tell what the expert's testimony would have been regarding the reasonableness of defendant's actions in negotiating or drafting the indemnity agreement. *Vandermay*, 147 Or App at 98. Consequently, it held that any error in excluding the expert's testimony would not justify reversal. *Id.* at 99.[7]

However, the Court of Appeals agreed with plaintiff that, in this case, expert testimony was not required, because defendant "either did or did not comply" with plaintiff's specific instructions to draft an indemnity agreement that would limit plaintiff's liability at the Astoria site to $5,000. *Id.* The Court of Appeals therefore reversed the trial court. *Id.*[8]

We granted defendant's petition for review to address whether, on these facts, plaintiff was required to offer expert testimony regarding whether defendant's conduct fell short of the required standard of care. According to defendant, expert testimony was required, because "what a reasonably careful attorney would have done is not something jurors are capable of answering on their own." Plaintiff responds that no expert testimony was required because, "[w]hen an attorney fails to follow a client's specific instruction, a jury using ordinary knowledge may be competent to consider the matter without the assistance of expert testimony."

---

[6] Defendant also argued that he was entitled to a directed verdict on other grounds, but the trial court did not rule on those additional grounds.

[7] In his cross-petition for review, plaintiff asserts that the Court of Appeals erred in holding that, absent an offer of proof, it could not consider whether the trial court erred in holding that a statewide standard of care applied in this case. As will become apparent, we need not address that issue.

[8] Plaintiff also argued to the Court of Appeals that the complaint could be read to state a claim for breach of contract in addition to negligence and that standard of care evidence is not relevant to a breach of contract claim. The Court of Appeals declined to address that argument because plaintiff had not made it at trial. *Vandermay*, 147 Or App at 99 n 1. We decline to address that argument on review for the same reason.

■    Defendant's motion for a directed verdict raised a question of law for the trial court, namely, whether plaintiff was required to present expert testimony to establish that defendant had breached the standard of care. *See Godell v. Johnson*, 244 Or 587, 590-91, 418 P2d 505 (1966) (motion for directed verdict asserts, as a matter of law, that evidence adduced by opposing party is not sufficient to submit issue to jury). A directed verdict for defendant was proper if plaintiff failed to present sufficient evidence regarding whether defendant's conduct fell below that required by the standard of care. *See Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 310 Or 333, 337, 798 P2d 656 (1990) (denial of motion for directed verdict proper if plaintiff presented sufficient evidence on issue).

■■    This court has not addressed whether expert testimony is required in legal malpractice actions to establish breach of the standard of care. However, this court has held that, "in most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community." *Getchell v. Mansfield*, 260 Or 174, 179, 489 P2d 953 (1971). Specifically, expert testimony is required if the issues are not within the knowledge of the ordinary lay juror. *Id.*; *see also Tiedemann*, 299 Or at 249 (expert testimony required regarding explanation that physician should have given to patient to receive informed consent); *Lynd v. Rockwell Manufacturing*, 276 Or 341, 349, 554 P2d 1000 (1976) (in design defect case, expert testimony required where issues were technical and beyond common knowledge and experience of average juror). Expert testimony is not required if, without an expert's opinion, the jury is capable of deciding whether the professional's conduct was reasonable. *Getchell*, 260 Or at 179-80.

■■    With respect to the need for expert witness testimony, legal malpractice actions are no different from other professional malpractice actions. Whether expert testimony is necessary to establish that a defendant's conduct fell below the standard of care is a legal question that the court must determine by examining the particular malpractice issues that the case presents.

Viewed in the light most favorable to plaintiff, the evidence in this case is that plaintiff told defendant that he wanted to limit his liability to $5,000 for cleaning up the contamination at the Astoria site, and he instructed defendant to prepare an indemnity agreement to accomplish that goal. Defendant understood that a limit on plaintiff's liability for cleaning up that site was a critical condition that plaintiff had placed on the sale of VanWest to Harris. Viewing the evidence in the light most favorable to plaintiff, plaintiff would not have sold VanWest if he had understood that he would be liable after the sale for substantially more money to clean up the Astoria site. Harris rejected the indemnity agreement that defendant had drafted at plaintiff's request and submitted another indemnity agreement at the closing meeting, but those facts did not alter plaintiff's directives to defendant to obtain the indemnification that plaintiff requested. Although defendant knew or should have known that the indemnity agreement drafted by Harris's lawyer did not limit plaintiff's liability for cleaning up the Astoria site to $5,000, defendant instructed plaintiff to sign that agreement nonetheless.

The facts surrounding the sale of VanWest were complicated, because the sale involved many agreements, there were disputes over which indemnity agreement would be acceptable to the parties, and both plaintiff and Harris were aware of the implications of environmental contamination. Nonetheless, whether defendant failed to warn plaintiff that the indemnification agreement that plaintiff was signing did not contain the protections that plaintiff insisted on is straightforward. If defendant failed to do so, then he breached the standard of care he owed to his client. A lay jury is capable of making that determination without expert testimony. The trial court therefore erred in granting defendant's motion for a directed verdict on the ground that, without expert testimony, plaintiff failed to present evidence from which the jury could find that defendant breached the standard of care.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.