Argued May 6, affirmed October 20, 1971

GETCHELL, *Appellant, v.* MANSFIELD ET AL,
*Respondents.*

489 P2d 953

*Levi J. Smith,* Portland, argued the cause for appellant. On the briefs were Smith, Todd & Ball, P.C., Patrick M. Smith and Richard M. Sandvik, Portland.

*George M. Joseph,* Portland, argued the cause for respondents. With him on the brief were Morrison & Bailey, Thomas E. Cooney, Gearin, Hollister & Landis, David C. Landis and Robert H. Hollister, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN and HOWELL, Justices.

DENECKE, J.

In this malpractice case the trial court granted a nonsuit in favor of the defendant physician Mansfield and the jury returned a verdict for the defendant physician Hiestand. The plaintiff appeals.

The plaintiff fell and hurt her shoulder. She went to the defendant Mansfield, a general practitioner in a small Portland suburb. He diagnosed her condition as a shoulder separation and advised that surgical repair would be necessary. He sent plaintiff to the defendant Hiestand, an orthopedist. Hiestand performed the surgery by joining the separated shoulder parts with wires. Later, the wires broke from causes which are in dispute. Because of the broken wires plaintiff has had to undergo further surgery and there is evidence she has a permanent disability in her shoulder.

The case against the orthopedist went to the jury only on charges that after surgery he failed to

properly immobilize plaintiff's shoulder and that he improperly instructed the plaintiff about exercises to be performed. The jury found for the orthopedist.

The trial court struck from the complaint allegations that the defendants were negligent in failing to advise plaintiff of the risks involved in correcting her condition by joining the parts with wires and in failing to advise her of alternative methods of treatment. The court granted the defendant Mansfield a nonsuit upon the ground that he had no duty to advise. The trial court further sustained objections to questions asked of the plaintiff about whether defendants had informed her of the risks involved in the surgery and alternatives to this type of surgery. The plaintiff assigns these rulings as error and states the question raised by these assignments to be: Is the duty of a physician to advise his patient of the risks involved in proposed surgical procedures and the alternative procedures available a duty imposed by law or one determined by the standard medical practice in the community? Stated more directly, the question is: Does a plaintiff have to introduce medical testimony to establish the duty to disclose?

The concept involved has been labeled, perhaps unwisely, "informed consent." In *Mayor v. Dowsett*, 240 Or 196, 234-235, 400 P2d 234 (1965), we accepted the concept. In that case the trial court refused to submit to the jury an allegation that the defendant physician failed to explain to plaintiff the dangers of a spinal anesthetic. We held the trial court erred. "The general rule regarding the duty of a physician to inform his patient of known dangers is not questioned." 240 Or at 235. We also held that while surgery without a consent based upon full knowledge by the patient

might be a technical battery, such conduct also can be pleaded and proved as negligence.[1]

In *Mayor v. Dowsett,* supra (240 Or 196), we did not examine the extent of the disclosure that must be made and whether expert testimony must be introduced to establish the extent of the duty to inform or disclose.

The decisions and the writers are in disagreement about the necessity of expert medical testimony to determine the extent of the duty to disclose. A majority of the decisions appears to hold that expert testimony is necessary. Some of the cases are collected at 75 Harv L Rev 1445 (1962), and 36 Ford L Rev 639, 658-666 (1968). A contrary decision is *Berkey v. Anderson,* 1 Cal App3d 790, 82 Cal Rptr 67, 79 (1970), which holds that no expert testimony is needed. A comment in 55 Calif L Rev 1396 (1967), is in accord with that view.

The particular facts here involved are helpful in answering the question.

Plaintiff's counsel asked her if she was advised that there was a danger in the proposed surgical procedure that the wires might break and cause pain and loss of function; and that there were alternative procedures, such as the use of a screw, cutting off the end of the collarbone, strapping, which did not involve surgery, or doing nothing. The objections to the questions

---

[1] By holding that such conduct can be negligent, we avoided what some writers consider to be grievous error; that is, considering the conduct to be battery, accompanied by the accouterments of battery, such as the statute of limitations. Plante, *An Analysis of "Informed Consent,"* 36 Ford L Rev 639, 650-653 (1968). Fraser & Chadsey, *Informed Consent in Malpractice Cases,* 6 Will L J 183, 185 (1970). The California courts, however, continue to refer to the conduct as a "technical battery." Berkey v. Anderson, 1 Cal App3d 790, 82 Cal Rptr 67, 79 (1970).

were sustained. On an offer of proof the plaintiff testified she would have chosen the taping (which apparently is identical to "strapping") although she "would probably end up with a frozen shoulder." She stated she would have chosen the tape because she had been taped previously, apparently for another injury, and her grandson had recovered rapidly when for some reason he had been taped.

The trial court ruled the testimony inadmissible. The court was of the opinion that medical testimony was necessary to establish whether the standard of medical practice required informing the patient of the alternatives available under these circumstances and "the question as proposed to the witness does not conform to the options and the consequences of the options as are placed in evidence."

In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community. The conduct of the defendant professional is adjudged by this standard. Without such expert testimony a plaintiff cannot prove negligence. The reason for this rule is that what is reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury. 2 Harper and James, Law of Torts, § 17.1, 966, 968 (1956). For example, would a jury know whether it is reasonable to permit tightly packed Surgicel to remain in the body? *Brannon v. Wood,* 251 Or 349, 359, 444 P2d 558 (1968); or less esoteric, when does reasonable medical practice require that an X-ray be taken of a fractured bone which had been successfully united seven years before? *Boyce v. Brown,* 51 Ariz 416, 77 P2d 455 (1938).

On the other hand, if the jury is capable of de-

ciding what is reasonable conduct without assistance from an expert medical witness no expert testimony is necessary to establish the standard of care. For example, a jury could find a surgeon was negligent without the assistance of expert medical testimony if the surgeon operated without sterilization of his instruments. See *King v. Ditto,* 142 Or 207, 214, 19 P2d 1100 (1933). In *Daly v. Lininger,* 87 Colo 401, 288 P 633 (1930), the court held that the jury, without expert testimony, could find the defendant dentist negligently severed a nerve when extracting a tooth.

The same criterion should be used when the negligence charged is the physician's failure to disclose; that is, whether or not a lay person is capable, without medical testimony, of making a competent decision upon the question of what a reasonable physician should tell his patient about the proposed treatment. When this criterion is applied to the facts in this case it becomes apparent that expert testimony is essential to establish some aspects of the standard of care, but not others.

A dissection of counsel's question to plaintiff illustrates this. He asked if she was advised by defendants of the risks involved in the use of wires; that the wires sometimes break and the function of the shoulder is sometimes lost.

■ We do not find it necessary that a physician tell the patient all the possible risks and dangers of the proposed procedures. A correct test would be to require the disclosure of all the "material" risks, results that might well occur, not dangers that are extremely remote; risks that are of serious consequences, not unexpected results that are of little consequence.

We are not here attempting to lay down an all-

encompassing rule to determine when a risk is material. Cases decided on the basis that the risk was not material are collected at Waltz and Scheuneman, *Informed Consent to Therapy*, 64 Nw U L Rev 628, 638-643 (1969). These authors state: "Materiality is the keystone of the physician's duty to disclose." 64 Nw U L Rev at 638.

■ Materiality is an issue which in most instances will require expert medical testimony. For example, does an infection and loss of vision occur after a cataract operation sufficiently often that a patient deciding whether to undergo such surgery should be advised of this possibility? Or, in the present case, what are the chances of the wires breaking and what will happen if they do break? These are matters about which medical testimony is essential.

Akin to the materiality requirement is the problem of whether the alternative treatment or surgery is feasible. In the case of a herniated disc, expert testimony is necessary to decide whether traction is a reasonable alternative to surgery. Again, in the present case, expert medical testimony is essential to enable a court or jury to decide whether using a screw is a feasible alternative to using wires.

There is another aspect of the problem which is not present in this case. "The cases have frequently stated that a physician is privileged to withhold information on specific risks when disclosure would be detrimental to his patient's well-being." 64 Nw U L Rev, supra, at 641. In most instances the determination of what is or is not detrimental will require expert testimony.

■ When there is medical testimony which establishes that a risk is material, that alternatives are

feasible, and that disclosure of the risk will not be detrimental to the particular patient, we find no reason why expert medical testimony should be required to establish the existence of a duty to disclose such risks. This is not a medical matter. Once materiality, feasibility and the effect of a disclosure on the patient is established by expert testimony, what physicians disclose or do not disclose in a particular locality about the risks and feasible alternatives of certain proposed treatment or surgery, if there is any standard practice, must be a happenstance because medical training and experience would be of little assistance on this aspect of the problem.

Courts have the obligation of determining when one person has a duty to another and the extent of that duty. *Dewey v. A. F. Klaveness & Co.*, 233 Or 515, 524, 379 P2d 560 (1963). Once materiality and feasibility are established by expert testimony, we find nothing about the question of whether a physician has a duty to disclose the risks of the proposed treatment to his patient to be any different than questions involving whether other duties exist.

We had no expert testimony to assist us in determining that a car dealer might owe a duty to remove the keys from the ignition of cars on his lot to a plaintiff who was injured when hit by a car stolen from the lot. *Mezyk v. National Repossessions*, 241 Or 333, 405 P2d 840 (1965).[2]

■ ■ We hold, therefore, that a plaintiff who alleges that a physician failed to warn him of material risks inherent in his treatment, and to advise him of

---

[2] It has been suggested that we might have decided more wisely if we had heard expert testimony.

feasible alternatives, need not produce expert medical testimony that it is the custom of physicians in the same or similar localities to give such warnings in comparable cases. The duty to warn and to advise of alternatives does not arise from and is not limited by the custom of physicians in the locality. Rather, it exists as a matter of law if (1) the risk of injury inherent in the treatment is material; (2) there are feasible alternative courses available; and (3) the plaintiff can be advised of the risks and alternatives without detriment to his well-being. If there is evidence tending to prove all these elements, the plaintiff is entitled to have his case submitted to the jury under proper instructions. In most cases, expert medical testimony will be necessary to establish each of the three elements.

Harper and James write forcefully that there should be no need in most cases for expert medical testimony to establish that disclosure of certain risks and alternatives is the customary medical practice:

> "Since the courts quite rightly recognize room for a doctor's therapeutic discretion in exercising his duty of disclosure, expert evidence of what is proper medical practice in that respect is relevant and is everywhere received. This is as it should be. But courts have generally gone much further and have *required* medical evidence that it is local professional practice to make the disclosure in question before a jury may find a doctor negligent in failing to make it, even where the treatment was an 'elective' one presenting no emergency. * * *.
>
> "Such a requirement in these circumstances is, it is submitted, an unwarranted abdication of responsibility and of the individual's right to make an informed choice, to the medical profession. * * *." 2 Harper and James, Law of Torts, 60-61, (1956, Supp 1968).

In the instant case, the record must be examined to determine if there was medical testimony that the risk of permanent disability from wires breaking was material and that the other alternatives included in the question were medically feasible.

The orthopedists called by the plaintiff were not asked what the probabilities were of the wires breaking and what effect the breaking would have. The defendant Dr. Hiestand, when called as an adverse witness, testified the breaking of the wires was not "a general risk" of using the wiring procedure. He stated they would not break if they were not subjected to too much strain.

Concerning the alternatives, Dr. Beals, an orthopedist called by the plaintiff, testified that shoulder separations are treated without surgery. He did not testify that this included the strapping treatment which the plaintiff said in the offer of proof that she would have chosen had she been informed of such treatment. Assuming that "strapping" was intended to be included in this nonsurgical treatment, he did not testify that strapping was feasible for plaintiff with her age and athletic desires. Dr. Beals said because of the plaintiff's desire to be able to play golf he would have proposed some sort of "internal fixation," meaning the use of some sort of metal such as wires, pins or a screw. Dr. Hiestand testified that because of the age of plaintiff and her desire to resume playing golf, binding the shoulder was not a feasible treatment procedure.

The record does not contain medical testimony that the risk of breaking wires and consequent permanent disability was a material risk for the type of surgery performed or that "taping" the shoulder and

not performing surgery was a feasible alternative under the circumstances. For this reason the trial court was correct in sustaining defendant's objections to the questions seeking to establish the lack of plaintiff's informed consent and in striking the plaintiff's allegations of negligence in failing to advise plaintiff.

Affirmed.

O'CONNELL, C. J., dissenting.

I am of the opinion that the trial court erred in striking from the complaint the allegation that defendants were negligent in failing to advise plaintiff of alternative methods of treatment.

The majority opinion sustains the trial court's action on the theory that taping plaintiff's shoulder was not a feasible alternative treatment because there was testimony that plaintiff expressed to Dr. Mansfield her desire to resume playing golf. Plaintiff was not informed of the alternative treatment by taping because defendants assumed she would not have chosen such an alternative because of her desire to play golf. This did not give plaintiff the opportunity to choose the treatment she preferred. The choice was made by defendants based upon an assumption which might not have been correct. Plaintiff testified that she would have chosen the treatment by taping. The jury could have believed her. The jury could also have disbelieved Dr. Mansfield's testimony that plaintiff expressed an interest in being treated in a manner which would allow her to continue playing golf. By striking the allegation of negligence based upon defendants' failure to inform plaintiff of the alternative methods of treatment, she was deprived of having the jury consider an important theory of her case.