Argued and submitted June 9, 2020, affirmed December 8, 2021

Patricia M. HOFF,
Individually and as Personal Representative
of the Estate of David P. Hoff,
*Plaintiff-Respondent,*

*v.*

CERTAINTEED CORPORATION, et al.,
*Defendants,*

*and*

KAISER GYPSUM COMPANY, INC.,
*Defendant-Appellant.*

Multnomah County Circuit Court
15CV23996; A162891

503 P3d 457

This is a products liability and negligence action that involves exposure to a product containing asbestos. The original plaintiffs, a husband and wife, now a single plaintiff on behalf of herself and the estate of husband, brought claims against multiple defendants, alleging that their products had caused husband's mesothelioma and resulting damages to both plaintiffs. After a jury trial, the jury rendered its verdict against the only remaining defendant, and found that defendant was strictly liable, that its negligence was a substantial factor in causing the mesothelioma, and that defendant's percentage of fault was 35 percent. On appeal, defendant argues that the trial court erred by denying its motion for directed verdict, granting plaintiffs' post-trial motion to amend their complaint to seek a greater amount in noneconomic damages, and entering a judgment against defendant that, contrary to ORCP 67 C, awarded noneconomic damages for the loss-of-consortium claim in excess of the damages that had been alleged in one of two parts of the complaint. *Held*: The trial court did not err by denying defendant's motion for directed verdict. Because plaintiffs did not file a second amended complaint, the trial court's ruling to allow plaintiffs' post-trial motion to amend was harmless, even if assumed to be error. And, the trial court did not err by entering judgment on the consortium claim in the net sum awarded.

Affirmed.

Judith H. Matarazzo, Judge.

J. Aaron Landau, argued the cause for appellant. Also on the briefs were Susan D. Marmaduke and Harrang Long Gary Rudnick P. C.

James S. Coon argued the cause for respondent. Also on the brief was Thomas, Coon, Newton & Frost.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeVORE, P. J.

Affirmed.

**DeVORE, P. J.,**

Defendant Kaiser Gypsum Company appeals from a judgment for plaintiffs.[1] David Hoff (Hoff), now deceased, and Patricia Hoff brought this product liability and negligence action arising from Hoff's alleged exposure to asbestos, which resulted in mesothelioma, an asbestos-related disease. They alleged that Hoff suffered the disease as a result of exposure to drywall joint compound manufactured and sold by defendant.[2]

Defendant raises three assignments of error. Defendant contends that the trial court erred by (1) denying its motion for directed verdict, (2) granting plaintiffs' post-trial motion to amend their complaint to seek a greater amount in noneconomic damages, and (3) entering a judgment against defendant that, contrary to ORCP 67 C, awarded noneconomic damages for the loss-of-consortium claim in excess of the damages that had been alleged in one of two parts of the complaint.

We conclude that (1) denial of defendant's motion for directed verdict was proper because there was sufficient evidence from which a jury could find that Hoff was exposed to defendant's product in the course of his work; (2) any arguable error in allowing plaintiffs' motion to amend their complaint after trial is harmless because plaintiffs did not actually file a second amended complaint; and (3) the judgment complied with ORCP 67 C because, notwithstanding inconsistent figures on consortium damages in the operative complaint—an inconsistency that defendant repeatedly failed to seek to clarify—the judgment entered was not in excess of the amount that was sought in the prayer. Making those conclusions, we affirm.

---

[1] This action was originally brought by two plaintiffs—husband and wife—David Hoff and Patricia Hoff. David Hoff died after the jury returned its verdict and before the trial court entered the judgment. The trial court substituted Patricia Hoff as personal representative of his estate in his place. Patricia Hoff is the only plaintiff in this appeal. When we refer to the proceedings below, we use "plaintiffs."

[2] There were 10 defendants named in the lawsuit, the case went to trial against three named defendants, and two of those defendants settled prior to jury deliberations. Kaiser Gypsum Company, Inc. is the only defendant appearing on appeal and is the party to whom we refer as "defendant."

"We review the denial of a motion for directed verdict for any evidence to support the verdict in favor of the nonmoving party." *Lyons v. Beeman*, 311 Or App 560, 563, 494 P3d 358, *rev den*, 368 Or 513 (2021) (internal quotation marks omitted). We view the evidence in the light most favorable to plaintiffs, "and, if the evidence supports more than one conclusion, we leave it for the jury to decide." *Id.* at 564. Unless there is no evidence from which the jury could have found the facts necessary to support plaintiffs' claim, we will not disturb the jury's verdict. *Id.*; Or Const, Art VII (Amended), § 3. We state the facts according to that standard.

## FACTS

Hoff worked for R.A. Gray Company (Gray), a general contractor, from late 1973 to sometime in 1980 and then again from the early 1990s until he retired in 2013. Hoff was diagnosed with mesothelioma in August 2015. In September 2015, Hoff brought claims against 10 defendants, including Kaiser Gypsum Company, that he alleged had manufactured or distributed asbestos-containing products to which he was exposed and that he alleged caused his disease. Hoff alleged that the asbestos-containing drywall products caused cancer when inhaled and that asbestos fibers were released "into the breathing zone of individuals working with or near the product, particularly during routine and anticipated use of the product." Hoff's wife brought claims against the same defendants for loss of consortium arising out of her husband's injury.

Hoff was a carpenter whose primary skills were framing and finish carpentry, jobs that were commonly done while drywall taping and finishing were underway on Gray job sites. He also frequently helped to sweep up the dust created by the sanding of drywall joint compound at job sites. Defendant's drywall joint compound contained asbestos for approximately two of the years that Hoff worked for Gray—from when he began working there in late 1973 until late 1975.[3]

---

[3] Defendant's joint compound contained asbestos until November 24, 1975, when defendant began to use a new formula that did not contain asbestos.

During the trial, plaintiffs provided testimony by two witnesses, Nemeth and Croft, who worked for Gray doing drywall finishing. Each of their tenures at Gray overlapped with Hoff's for some period of time. Nemeth, who worked at Gray for a year or less in the early 1970s as a drywall finisher, testified about the drywall finishing process and explained that joint compound, which he referred to as "mud," and tape are used to cover the joints of drywall sheets (sheetrock) that are hung.[4] Several coats of mud are applied, and each coat is sanded so that the walls and ceilings become smooth. The sanding process is extremely dusty, and the room gets foggy because the dust floats in the air. After a room is sanded, it "would be very—very foggy with dust. Foggy with dust, dust on the floor, dust everywhere." During the time he worked at Gray, Nemeth recalled using four brands of joint compound that he said were "commonplace" at Gray. Although he could not identify specific jobsites where he used specific products, one was defendant's product. When asked to explain his usage of the word "commonplace," Nemeth said, "They usually use, generally, certain brands. While they used many different brands, they generally used certain brands, and these—those are the brands I remember using." He also testified that "[t]hey would be on most every job. *** [T]he reason I remember these brands is because that's what they mostly used."

Nemeth testified that he ran across Hoff a few times on the different jobs he worked on for Gray. Although he could not specify the names of the projects where he recalled seeing Hoff, Nemeth recalled two commercial jobs—office buildings—located in Tigard and Beaverton where he saw Hoff on site. One particular time, at an office building in Beaverton, Nemeth was at the site to do some drywall patching, and he spoke with Hoff at length. Hoff had been sweeping in a hallway at the time, as superintendents sometimes did toward the end of a job.

---

[4] On direct examination, Nemeth estimated that he worked at Gray from early or mid-1972 to early or mid-1973. During cross-examination, he was reminded that at an earlier deposition he had testified that he worked there from 1973 to 1974; he acknowledged that he did not remember the exact dates. In either case, his work at Gray was during the time when defendant's joint compound contained asbestos.

Croft worked at Gray in the 1970s for approximately seven years.[5] He and two other employees had the primary responsibility for installing the drywall and finishing it on the various job sites. His duties involved sanding drywall joint compound, and he explained that there was not any way to sand without creating dust. Sanding was exhausting and messy work, and sometimes he would have to sand for four hours at a time. Similar to Nemeth's testimony, Croft explained that dust filled the atmosphere, and the people in the room would get covered in dust. In addition, the dust would be transported throughout the building by the HVAC system, and it was not confined to the room where sanding was taking place.

Some of the jobs Croft worked on were quite large—three or four-story buildings with as much as 10,000 feet per floor—and there would be a lot of trades working on the buildings at the same time. Croft worked on different jobs with Hoff as a peer and as his supervisor. He testified that he recalls projects where he was on site doing his job when Hoff was also present at the worksite. Croft named some specific projects where he recalls having seen Hoff, and he also stated that he "probably was in contact with [Hoff] on, who knows, it could have been 20 or 30 jobs. It might even be more, I don't know; but we were—we were on a lot of common work sites." He recalled working as the drywall finisher, which included sanding, at some of the same projects that Hoff also identified as projects at which Hoff worked in the 1973 to 1975 time period.

Croft named four major brands of joint compound that Gray used while Croft worked for Gray, one of which was defendant's product. Croft could not place a particular joint compound brand at a specific job site but stated that they were used "very often" on Gray's projects. He said that they used "huge quantities" of those four products:

> "[T]hey would deliver the products on a pallet, and there'd be, oh, probably 20 or 30 boxes per pallet; and they'd deliver several pallets, and sometimes we'd go through a few more

---

[5] Croft was unsure of the exact years—he originally testified that he thought it was 1970 to 1977, but later agreed that it could have been 1972 or 1973 to 1978 or 1979.

pallets. So we used hundreds of boxes and buckets of the materials.

"*****

"*** [F]or [each] job, probably, depending on the size of the job, from a little job, maybe 20 boxes or buckets; and for a bigger job, it could be hundreds."

When asked whether those four products were used on the same projects where he worked with Hoff, he said "yes" and explained that they "used those products on a regular basis; [he] was on numerous jobs with David Hoff; and, to draw a logical conclusion, those products were used by [him] on jobs where [Hoff] was present *** on a regular basis." Croft also explained that the other two drywallers that he worked with used the same products; he knew this because they would share the buckets of product while working on a project.

Hoff's testimony was that, after his cancer diagnosis, he tried to figure out whether he had had exposure to asbestos during his career.[6] He determined that drywall compounds were "probably the predominant ones." He testified about his work history at Gray, including the projects he had worked on, what his job duties as a carpenter had been, and whether drywalling had taken place at a particular project. He identified five work projects where he worked before 1976 that also involved drywall installation and finishing.[7] One of those projects was a commercial complex that included an office building and was approximately 30,000 to 35,000 square feet in size. Another project was a house that was approximately 4,500 square feet. And another was a commercial building that was 15,000 to 18,000 square feet.

Hoff explained that it was "very common" to be doing his work as a carpenter at the same time that other people were doing drywall application and finishing on the same project. He said that he "would get [to a project] when they would be doing more of the siding or the finish end of

_____

[6] Hoff's testimony had been taken at an earlier deposition, which was then presented to the jury at trial.

[7] We note that, at oral argument, the parties agreed that the evidence at trial demonstrated that there were three sites where Hoff worked and where Gray's own employees, rather than subcontractors, did the drywall work.

the projects where the drywall was going on" and that he was "often present for the taping and the finishing * * * process." They were not on top of each other but were in the building at the same time; it was a way of managing the project to do more than one phase at a time. He explained, similarly to other witnesses, that drywall sanding is a dusty process and that part of his job to help keep a project moving along—even after he became a superintendent—was to use a broom to clean up the dust that had settled on the floors. Hoff also testified that defendant's product was one of the joint compounds that Gray used in the 1970s.

## MOTION FOR DIRECTED VERDICT

At the close of all the evidence, defendant moved for directed verdict under ORCP 60 on the issue of exposure to asbestos, contending that plaintiffs had failed to provide evidence that Hoff had been exposed to defendant's asbestos-containing joint compound at the sites where he had worked.[8] In defendant's view, there was no basis for the jury to conclude without speculation that Hoff had been exposed to its product. Plaintiffs argued that the evidence was sufficient for the jury to make reasonable inferences to find that defendant's joint compound had been used on one of the job sites where Hoff had worked with Croft or Nemeth and that Hoff had therefore been exposed to it. The trial court denied defendant's motion.

In its first assignment of error, defendant contends that the trial court erred in denying its motion for directed verdict. The parties agree that it was plaintiffs' burden to show that it was more probable than not that Hoff was exposed to defendant's joint compound during the period when it contained asbestos. Defendant reprises its contention that there was no evidence at trial from which a reasonable juror could find that Hoff had been exposed to defendant's asbestos-containing joint compound. Defendant's contention is based on a two-part argument that plaintiffs were required to provide evidence of exposure to defendant's product at a particular location and that plaintiffs did not

---

[8] Defendant had informed the trial court of its intention to move for directed verdict earlier in the case; as a matter of scheduling, the motion was argued to the trial court while the jury was deliberating.

provide evidence that Gray had used defendant's asbestos-containing product at any particular work site when Hoff had been present.

Plaintiff responds that, construing the evidence and all reasonable inferences in her favor, there was evidence in the record from which a reasonable juror could have found it more likely than not that defendant's product had been present on at least one of the sites where Hoff worked before 1976. *See Trees v. Ordonez*, 354 Or 197, 218-19, 311 P3d 848 (2013) ("[W]e review to determine whether there was any evidence from which a reasonable jury could find that it was more probable than not that defendant's alleged negligence *** caused plaintiff's injury."). Plaintiff argues that, considering the number of job sites where Hoff had potential exposure to defendant's joint compound and the number of brands of joint compounds that Gray commonly or regularly used, it was permissible for the jury to infer exposure.

Defendant relies on *Purcell v. Asbestos Corp., Ltd.*, 153 Or App 415, 959 P2d 89, *adh'd to as modified on recons*, 155 Or App 1, 963 P2d 729 (1998), in support of its contention that plaintiffs were required to prove that Hoff had been exposed to its product at a particular location. In *Purcell*, the plaintiff was exposed to asbestos during his 35-year employment with several employers at numerous job sites. He had worked as an electrician and had been exposed to airborne asbestos fibers from several types of asbestos products from multiple sources at more than 100 sites. He brought a lawsuit against 18 defendants. *Id*. at 418-19.

On appeal, two of the defendants challenged the trial court's denial of their motions for directed verdict. They argued, in part, that the plaintiff had "failed to offer adequate proof of his exposure to their asbestos-containing products, as distinct from products of other manufacturers, to permit the inference that their products caused his disease" and that the "plaintiff failed to provide sufficient evidence to link their products to the work sites at which he sought to show that he was exposed to airborne asbestos fibers." *Id*. at 420, 424. We explained that the plaintiff's "evidence was directed at showing that one or both of the defendants' products were located *at various sites* at the times

that plaintiff worked there." *Id.* at 424 (emphasis added). We concluded that,

> "[a]lthough the parties make detailed site-by-site arguments about the proof of plaintiff's exposures to defendants' products, it is unnecessary for us to engage in similar detail in our discussion, given the legal standard that we have held applies to the question. Plaintiff's evidence sufficed to allow the jury to infer that [the plaintiff] was exposed to asbestos-containing products of both defendants, singly or in combination, at each of the work locations that the trial court allowed the jury to consider."

*Id.* We held that the trial court did not err in denying the defendants' motions for directed verdict. *Id.* at 426.

Defendant argues that *Purcell* stands for its proposition that plaintiffs were required to prove that Hoff was exposed to its product at a particular job site. However, we do not agree that the test is as stringent as defendant suggests. In *Purcell*, the evidence happened to have been sufficient for the jury to infer that the plaintiff had been exposed at particular sites, but we did not hold that all plaintiffs must prove their case in that way. We observed, "[O]ur review is limited to whether the evidence was adequate to allow the jury to find what it did." *Id.* at 425. The key was not that the evidence showed exposure at *each* work site but simply that the evidence showed exposure to the defendants' products.

In this case, plaintiffs were required to prove that it was more likely than not that Hoff had been exposed to defendant's asbestos-containing product at one or more work sites. Here, there was evidence that Croft, a drywall worker, saw Hoff on 20 to 30 job sites. Prior to 1976—during a two-year time period when defendant's product contained asbestos—Hoff identified five job sites at which he was present and where drywall work was being done. Three witnesses—Nemeth, Croft, and Hoff—testified that defendant's product was used in the 1970s by drywallers on Gray's job sites. Nemeth and Croft testified that defendant's product was one of four joint compounds that was commonly used.[9]

---

[9] They each named four brands, not all of which were the same ones named by the other; considered together, there were six brands that were commonly used.

Nemeth was employed by Gray only during the timeframe when defendant's product contained asbestos, and Nemeth testified that defendant's product, among others, was used on Gray's job sites. Croft explained that, depending on the size of the job, hundreds of packages of joint compound could be used at a worksite. Both witnesses who performed drywall work testified that they had encountered Hoff on a job site more than once.

We repeat what our question is and what it is not. As in *Purcell*, our question is whether the evidence permits a reasonable inference that, more likely than not, Hoff was exposed at some time to defendant's asbestos-containing product. Unlike *Purcell*, we are not asked to consider whether there was sufficient evidence to support medical causation.

In regard to circumstantial evidence and reasonable inferences, we have stated:

> "Whether particular circumstantial evidence is sufficient to support a particular inference * * * is a legal question for a court to decide. There is a difference between inferences that may be drawn from circumstantial evidence and mere speculation. Reasonable inferences are permissible; speculation and guesswork are not."

*State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004) (citations and internal quotation marks omitted). We also stated that we agreed with a description by federal courts that

> "[t]he line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts."

*Id*. (internal quotation marks omitted).

Given our standard of review, we conclude that the evidence was sufficient for the jury to infer that over a two-year period, Hoff would have been exposed to defendant's product that was commonly used on Gray work sites

for drywall work. Defendant's product contained asbestos during that time. Defendant's product, among others, was on Gray's job sites. Hoff worked at Gray's job sites. A reasonable juror could find that defendant's product was used on at least one of the work sites where drywall work occurred in Hoff's presence or where drywall dust was created that Hoff had exposure to—such as during sweeping and cleaning up the dust. The common use of defendant's joint compounds, their recurring opportunity for use at multiple job sites, the volume of product that was used at larger jobs, and the confirmation of the product's use by multiple witnesses, collectively, makes reasonable the inference that they were used when Hoff worked. The record, viewed in the light most favorable to plaintiff, provides sufficient evidence for a finding that Hoff was exposed to defendant's product. Therefore, we affirm the trial court's denial of defendant's motion for directed verdict.

## PLAINTIFFS' MOTION TO AMEND

Defendant's second and third assignments of error involve uncertainty about the pleading of damages for loss of consortium. An account of that uncertainty relates to both assignments.

Plaintiffs' initial complaint was filed in September 2015. The trial court permitted plaintiffs to amend their complaint to add punitive damages with an amended complaint in March 2016. In the "damages" allegations in the body of the amended complaint, plaintiffs allege noneconomic damages for Hoff himself "in the amount of no less than $5,000,000"; medical expenses for Hoff "in the amount of no less than 250,000"; and loss-of-consortium damages "in the amount of $1,000,000" for Hoff's wife, Patricia Hoff. Following those allegations, the amended complaint contains a prayer for judgment against defendants that, in part, repeats the damage amounts alleged in the body of the complaint for Hoff, but seeks $2,000,000 for Patricia Hoff's loss-of-consortium claim. Defendant did not file a motion to prompt plaintiffs to make more definite and certain which of the two sums was sought for her consortium claim. *See* ORCP 21 D ("[T]he court may require the pleading to be made definite and certain by amendment when

the allegations of a pleading are so indefinite or uncertain that the precise nature of the charge * * * is not apparent.") Instead, defendant simply answered. Defendant's answer generally denied that its products caused or contributed to plaintiffs' alleged damages.

At trial, defendant submitted a proposed jury instruction regarding the loss-of-consortium claim; it included a sentence stating, "The amount of noneconomic damages for loss of consortium may not exceed the sum of $1,000,000." Without objection, the trial court did not give that instruction to the jury. During colloquy with counsel to discuss the instruction to be given for noneconomic damages regarding Hoff himself, counsel for one of the other codefendants (still in the case at the time) and counsel for plaintiffs proposed that the last sentence of the uniform jury instruction—which provides for a limit to the damage amount—be removed. In response, the trial court stated, "All right. If nobody else cares I don't care." The parties next discussed the instruction to be given regarding loss of consortium. The trial court stated, "I don't have a preference one way or the other whether you keep in the 'may not exceed'; but you didn't on the other, so do you want that struck as well?" Plaintiffs' counsel responded, "Just take it out and be consistent, Your Honor." Defendant did not object. As a consequence, the jury was not instructed that there was any limit on the amount of damages they were to decide on. Defendant has not assigned error to the trial court's failure to have given its instruction limiting the consortium claim to $1,000,000.

The jury considered a special verdict form when only one defendant remained in the case after the conclusion of the evidence. Others had settled. The jury determined that defendant Kaiser Gypsum was strictly liable, that its negligence was a substantial factor in causing Hoff's mesothelioma, and that defendant's percentage of fault relative to other, settled, former parties was 35 percent. The jury's verdict found losses of $750,000 for medical expenses, $4,000,000 for Hoff's noneconomic damages, and $4,000,000 for Patricia Hoff's noneconomic damages. Defendant did not object to the amount of the verdict as exceeding the damages alleged in the pleadings or otherwise claim that there

was any other irregularity in the proceedings involving the verdict.

Both parties filed post-trial motions. Plaintiffs filed a post-trial motion for leave to amend the complaint under ORCP 23 B to conform with the evidence adduced at trial. Specifically, plaintiffs sought to

> "change the claimed damages for economic loss from medical bills from not less than $250,000 to $750,000 * * *; the claimed loss of consortium for Mrs. Hoff from damages * * * 'in the amount of $1,000,000' to 'in the amount of $4,000,000;' [and] the prayer for relief for Mrs. Hoff's consortium claim from '$2,000,000' to '$4,000,000.'"

Plaintiffs noted that the amended complaint had contained a drafting error in that it had alleged $1,000,000 of noneconomic damages for Patricia Hoff but requested $2,000,000 in the prayer at the conclusion of the complaint.

Defendant filed a post-trial motion to reduce the verdict to conform to the pleadings and the evidence. Defendant asked the trial court to reduce the medical expense award to reflect the amount of medical expenses that was supported by evidence plaintiffs had presented to the jury. Defendant also asked the trial court to reduce the verdict for Patricia Hoff's noneconomic damages to $1,000,000—the amount alleged in the main body of plaintiffs' amended complaint. Defendant did not file a motion, then or later, for relief from judgment under ORCP 71.[10]

The net result of the trial court's rulings on the motions was that the trial court granted defendant's motion to limit economic damages, but not the consortium damages, while granting plaintiffs' motion to amend as to the consortium claim. Plaintiffs' counsel noted that the new complaint, yet to be filed, would become the operative complaint, and the court agreed. Plaintiffs, however, did not actually file an amended complaint that reflected the permitted amendments.

The trial court subsequently entered a general judgment and money award. That judgment reflects that, at

---

[10] In its opening brief, defendant explains that ORCP 71 B did not apply under the circumstances.

a post-trial hearing the trial court had reduced the medical-expense award. The judgment states that defendant's fault of 35 percent, after the verdict, results in defendant's total liability for $2,919,473.50. That total is comprised of $119,473.50 for medical expenses, $1,400,000 in noneconomic damages for Hoff, and $1,400,000 in noneconomic damages for Patricia Hoff.

In its second assignment, defendant asserts that the trial court erred in granting plaintiffs' post-trial motion to amend their complaint by increasing the amount of loss of consortium damages. In response, plaintiff argues that, if the trial court so erred, that error was harmless because they never filed a second amended complaint, leaving the first amended complaint in place as the operative complaint. Defendant agrees that the first amended complaint is the operative complaint, but argues that the trial court's granting of the motion was not harmless because the court proceeded as though the second amended complaint had been filed and permitted an award of $1,400,000 in loss of consortium damages (35 percent of $4,000,000). We agree with plaintiff that any alleged error in granting the motion to amend was or would be harmless. The second amended complaint was not filed. The first amended complaint remained the operative complaint.

Nevertheless, defendant insists that it was harmed because an award was entered against it in conformance with the proposed amended pleading. However, that argument is misdirected. That claimed harm is not the result of permission to file a second amended complaint, which was never filed. Rather, that claimed harm is a question about the consistency of the complaint and judgment. The challenge to that judgment is defendant's third assignment of error, to which we now turn.

## ENTRY OF JUDGMENT

For its third assignment, defendant asserts that the trial court erred in entering a judgment against it that awarded noneconomic damages on the claim for loss of consortium in excess of the damages that, earlier in the body of the complaint, plaintiffs alleged was suffered. In defendant's view, that initial allegation asserted that Patricia

Hoff sustained damage "in the amount of $1,000,000" for loss of consortium, and defendant relied on that allegation as the maximum liability for her claim. The jury's verdict determined that Mrs. Hoff suffered $4,000,000 as noneconomic damages and, after attribution of defendant's fault of 35 percent, the judgment rendered defendant liable for $1,400,000 in her noneconomic damages. Defendant contends that the judgment did not comply with ORCP 67 C and the Fourteenth Amendment to the United States Constitution. Defendant argues that entry of the judgment was error because defendant was not given notice that it could be exposed to such damages. Defendant asks that we modify the judgment.

In response, plaintiff asserts that, because the complaint's prayer requested noneconomic damages for Patricia Hoff in the amount of $2,000,000, defendant had notice that it could be exposed to damages up to that amount. Plaintiff stresses that ORCP 67 C concerns "the amount *prayed* for." As a result, plaintiff concludes, the trial court did not err in entering a judgment that contained an award for $1,400,000, which was still less than "the amount prayed for."

We are not persuaded by plaintiff's arguments that defendant invited error or that, because it failed to preserve an objection to the verdict, defendant is precluded from asserting its argument about entry of judgment. We conclude, however, that the remaining basis for appeal is narrow. That basis is only defendant's challenge to the entry of judgment founded on ORCP 67 C, and, ultimately, that challenge cannot succeed.

We begin by observing what defendant has *not* claimed as error. Defendant says in its reply brief that "defendant's appeal does not concern instructional error." Defendant continues, "[I]rrespective of whether the *verdict* was contrary to the law, this appeal challenges the *judgment* under Rule 67." (Emphasis in original.) In effect, defendant makes direct and indirect concessions that are appropriate. Defendant did not object to, nor assign error to, the failure to give its instruction limiting damages. *See* ORCP 59 H (requirement for exception to jury instructions). Defendant did not object to receipt of the verdict as employing a raw

number for Patricia Hoff's noneconomic damages in excess of her allegation in the body of the complaint. *See Estate of Maria Refugio Ibarra v. Lilly*, 245 Or App 294, 295-96, 263 P3d 1053 (2011) (failure to object to the verdict before the jury was discharged waived the objection later raised by motion) (citing *Building Structures, Inc. v. Young,* 328 Or 100, 108, 968 P2d 1287 (1998))). Defendant did not file a motion under ORCP 71 to set aside the judgment. Finally, defendant has not explicitly or appropriately assigned error to the denial of its post-trial motion to reduce the verdict regarding the loss-of-consortium damages. *See* ORAP 5.45 (requirements for an assignment of error). Therefore, we do not understand defendant to argue that the trial court erred by *not* instructing the jury that it needed to limit the amount of damages it awarded; we do not understand defendant to argue that the court erred in accepting the jury's verdict with a preliminary consortium loss (*i.e.*, undivided among defendant and settled parties) that was higher than the prayer itself, and we do not understand defendant to challenge the denial of any post-trial motion. Defendant challenges something else.

Defendant challenges the entry of the judgment. We consider but reject that narrow challenge under the terms of its own rationale. As its source of authority, defendant relies on ORCP 67 C, which states:

> "Every judgment shall grant the relief to which the party in whose favor it is rendered is entitled. *A judgment for relief* different in kind from or *exceeding the amount prayed for in the pleadings may not be rendered* unless reasonable notice and opportunity to be heard are given to any party against whom the judgment is to be entered."

(Emphases added.) Although defendant contends that the Fourteenth Amendment to the United States Constitution protects a defendant from being deprived of property without first being provided reasonable notice and an opportunity to be heard, it does not develop a separate constitutional argument in that regard and relies on ORCP 67 as the basis for its argument. We do not consider defendant's undeveloped constitutional argument. *See PGE v. Ebasco Services, Inc.*, 353 Or 849, 306 P3d 628 (2013) (where the due process argument *was* developed and violation of ORCP 67 C

occurred, no constitutional violation occurred because the defect in prayer was apparent on the face of the complaint and defendant neglected multiple opportunities to challenge the defect). Instead, we consider defendant's procedural challenge under ORCP 67.

ORCP 67 C provides that a judgment may not be rendered for relief exceeding the amount "prayed for in the pleadings" unless reasonable notice and opportunity to be heard are given. Our cases show that statements in the prayer suffice, even when the earlier text of the complaint may seem lacking. We have repeatedly held that the prayer in a complaint provides notice to the opposing party as to the relief being requested. In *Bruce v. Cascade Collections, Inc.*, 199 Or App 59, 110 P3d 587, *rev den*, 339 Or 66 (2005), we considered the issue of a trial court's denial of an award to the plaintiff of attorney fees based on its conclusion that the plaintiff had failed to adequately plead an entitlement to fees. The prayer of the plaintiff's first amended complaint sought judgment against the defendant for various damages "together with her costs and expenses of this action and reasonable attorney fees." *Id*. at 61 (emphasis omitted). We stated that "it makes no difference * * * whether the defendant was fairly alerted by the allegations of the first claim for relief or by the content of the prayer describing the relief sought for that claim," and we remanded for the trial court to reconsider the plaintiff's request. *Id*. at 66, 68 (internal quotation marks omitted). *See Little Whale Cove Homeowners Assoc. v. Harmon*, 162 Or App 332, 342, 986 P2d 616 (1999) (statements in the defendant's prayer were sufficient to put plaintiff on notice that they intended to seek attorney fees); *cf. Lewis v. Dept. of Rev.*, 294 Or 139, 143, 653 P2d 1265 (1982) (observing that, in other cases, the plaintiffs' express prayers for attorney fees had "put the defendant on notice that should plaintiff prevail defendant might be liable for an award of attorney fees").

On the other hand, we do enforce ORCP 67 C, holding that a default judgment may not be entered to the extent that it exceeds the amount sought in the prayer for relief. *See Montoya v. Housing Authority of Portland*, 192 Or App 408, 416, 86 P3d 80 (2004) (determining a violation of ORCP 67 C and due process where the amount of economic damages

exceeded the prayer); *see also Kirresh v. Gill*, 309 Or App 47, 66-67, 482 P3d 76 (2021) (determining violation of due process warranting relief under ORCP 67 C where forfeiture remedy had not been asserted in the operative complaint or adequately raised during the proceedings leading up to the judgment).

The decision in *PGE*, 353 Or 849, is instructive. In the prayer of its breach of contract claim, PGE alleged that its liability insurance carriers were "liable to reimburse [PGE] the settlement of the underlying lawsuit." *Id*. at 851. It did not allege the dollar amount of damages that it sought. PGE obtained a default judgment against one of its carriers, Lexington, in the amount of $800,000. Lexington sought unsuccessfully to have that judgment set aside under ORCP 71 C. The matter was ultimately decided by the Supreme Court, which first considered ORCP 67 C, holding that because PGE's complaint did not "seek any amount of damages," the default judgment awarding damages violated ORC 67 C. *Id*. at 858.

That did not mean, however, that the judgment violated the notice requirement of due process. *Id*. at 860. The court observed that the pleading defect involving the amount of damages was apparent on the face of the complaint when Lexington was served with the complaint. *Id*. at 864. Although Lexington had been defaulted, the court observed that Lexington's challenge to the pleading defect was something that Lexington could have sought to remedy in multiple ways before judgment, such as a motion to make more definite and certain under ORCP 21 D or a motion to dismiss for failure to state a claim under ORCP 21 A(8). *Id*. at 864-65. The court concluded that Lexington's challenge came "too late." *Id*. at 865. The court did not set aside the judgment for $800,000.[11]

In the case at hand, plaintiffs' pleading defect is different than that in the *PGE* decision, but defendant's failure

---

[11] The Supreme Court remanded the case to the Court of Appeals to determine whether the amended complaint, which sought additional relief in the form of attorney fees but which was not served on Lexington, could be set aside and whether the trial court erred in denying the motion on the ground of excusable neglect. *Id*. at 865-66.

here is similar to Lexington's failure there. Accordingly, the *PGE* decision provides a contrast and a parallel. The contrast is that, here, plaintiffs pleaded a sum certain in their prayer for noneconomic loss of consortium damages. Thus, the pleading problem is an inconsistency between an earlier alleged sum and a later prayer for sum, not a failure to pray for an amount of damages.

Even so, defendant argues that the prayer of $2,000,000 did not give it notice of exposure to a judgment of $2,000,000—or even $1,400,000—when an earlier allegation in the complaint was $1,000,000. We recognize that, as a matter of notice, the difference between the two numbers in the amended complaint might have been puzzling or confusing. For that reason, the Supreme Court's observation, when considering notice for purpose of due process, provides a useful parallel for our consideration of notice for purpose of ORCP 67 C.

Defendant litigated the case from beginning to end, and defendant had several opportunities to verify or clarify its potential exposure.[12] Most obviously, defendant, could have filed a motion under ORCP 21 D to request that the complaint be made more definite and certain in regard to damages, but defendant did not file such a motion. Before the jury deliberated, defendant could have pursued a limit on consortium damages in instructions to the jury; but, during the trial court's discussion with counsel, defendant did not object to the removal of language that would have limited consortium damages. Finally, when the jury returned its verdict, defendant could have objected to the verdict, if defendant believed that the raw figure of $4,000,000 for consortium damages was impermissible or that the net result of the verdict exceeded the sum sought in judgment.[13] However, defendant did not object to the verdict.

---

[12] We also recognize that a defendant might calculate its litigation risk with a hope that damages may be divided with other defendants. Yet, defendant knew at the outset that other defendants might settle, leaving defendant the lone defendant at the time the jury was to begin deliberations, as happened here. There was no assurance of how fault might be divided, if at all, when the operative complaint sought a judgment of $2,000,000 in consortium damages against defendant.

[13] We are not asked to and we do not opine on the result of such objections.

In other words, the figures on consortium damages were an obvious inconsistency that defendant could readily see and had many chances to remedy but did not.

That inconsistency does not mean that, in these circumstances, the operative complaint did not provide notice as required by ORCP 67 C for entry of a judgment. To borrow the terms of the rule, the amount that plaintiffs "prayed for" as a judgment against the lone defendant was greater than the amount that the judgment actually awarded. After defendant's repeated failures to clarify or limit the consortium damages, the prayer afforded defendant notice that its net exposure for damages on the consortium claim was $2,000,000. The judgment's entry with a consortium award for $1,400,000 does not violate ORCP 67 C.

## CONCLUSION

In sum, the trial court did not err, on this record, by denying defendant's motion for directed verdict. Because plaintiffs did not file a second amended complaint, the trial court's ruling to allow plaintiffs' post-trial motion to amend is harmless, even if assumed to be error. And, the trial court did not err by entering judgment on the consortium claim in the net sum awarded.

Affirmed.